UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| John Doe and Jane Doe,<br><br>                        Plaintiffs,<br><br>v.<br><br>City of Simpsonville, Jason Weibel, Justin Chandler, Greenville Health System, Mary Schneider, Carolina Emergency Physicians, PA, Teressa Oldson, Richard Mills, Chestnut Hill Mental Health Center, Inc. d/b/a SpringBrook Behavioral Health System, Jill Aiken, Sergio Sanchez, Kia Morgan, and Richard Roes #1-100,<br><br>                        Defendants. | Civil Action No. _:__-CV-_____-___<br><br><br><br>**COMPLAINT**<br>**(Jury Trial Demanded)** |

Plaintiffs, complaining of Defendants, would respectfully show the Court the following:

**PARTIES**

1. Plaintiff John Doe—hereinafter referred to as "Plaintiff"—is a fictitious name referring to a citizen of the State of South Carolina whose true identity is known to the parties. Given the stigma associated with allegations of mental illness, however unfounded, Plaintiff respectfully seeks the right to proceed under a pseudonym.

2. Plaintiff Jane Doe is a citizen of the State of South Carolina—hereinafter referred to as "Plaintiff's wife" or referenced in that fashion—is a fictitious name referring to a citizen of the State of South Carolina whose true identity is known to the parties. Disclosing Plaintiff's wife's identity would disclose the identity of Plaintiff, therefore she likewise seeks the right to proceed under a pseudonym.

3. Defendant City of Simpsonville is a city of the State of South Carolina.

4. Defendant Jason Weibel is a police officer employed by the City of Simpsonville.

5. Defendant Justin Chandler is a police officer employed by the City of Simpsonville.

6. Defendant Greenville Health System is a governmental entity responsible for the operation of Greenville Memorial Hospital.

7. Defendant Mary Schneider is a social worker employed by Greenville Health System.

8. Defendant Carolina Emergency Physicians, PA ("CEMPA") is a professional association with a principal place of business in Greenville County, South Carolina that is organized under the laws of South Carolina. CEMPA is an independent contractor of Greenville Health System that provides emergency department physician staffing at Greenville Memorial Hospital.

9. Defendants Teressa Oldson and Richard Mills are physicians employed by CEMPA who staffed the Greenville Memorial Hospital Emergency Department at times relevant to this action.

10. Chestnut Hill Mental Health Center, Inc. d/b/a SpringBrook Behavioral Health System is a private mental health hospital in Greenville County, South Carolina. It is a corporation organized under the laws of South Carolina whose principal place of business is in Greenville County.

11. Jill Aiken is an employee of SpringBrook Behavioral Health System.

12. Sergio Sanchez is an agent of SpringBrook Behavioral Health System.

13. Kia Morgan is an employee of SpringBrook Behavioral Health System.

14. Richard Roes #1-100 are individuals involved in the tortious and otherwise actionable conduct described herein whose names are not known to Plaintiffs at present but whose involvement may be disclosed through discovery.

**FACTS**

15. All of the following occurred at dates and times known to the parties within the statute of limitations.

16.     In the course of a family argument, a family member of Plaintiff called the police and said that Plaintiff was suicidal and homicidal.

17.     The allegation of suicidal and homicidal conduct was false, and was made solely for the purpose of gaining leverage against Plaintiff in financial disputes between Plaintiff and other family members.

18.     Police officers employed by the City of Simpsonville arrived and detained Plaintiff. The police did not witness any suicidal or homicidal conduct by Plaintiff, and Plaintiff denied being suicidal or homicidal. Plaintiff stated that his family members were not telling the truth.

19.     The police asked Plaintiff if he would consent to being evaluated by EMS. Plaintiff consented, and the police called EMS.

20.     EMS arrived on scene and evaluated Plaintiff. The EMS paramedics determined that Plaintiff was neither suicidal nor homicidal. The paramedics EMS paramedics asked Plaintiff if he would nonetheless like to go to the hospital, and Plaintiff declined.

21.     EMS departed the scene, but the police retained custody of Plaintiff allegedly pursuant to S.C. Code § 44-13-05. Patrolman Jason Weibel then transported Plaintiff to be evaluated in the Greenville Memorial Hospital Emergency Department.

22.     Plaintiff complained that he had already been cleared by EMS and objected to being transported to the hospital, but Weibel ignored Plaintiff's complaints and transported him anyway.

23.     After Plaintiff arrived at Greenville Memorial Hospital, Weibel handed him off to Greenville Memorial Hospital security, who held Plaintiff in custody at an exterior door in the vicinity of the Emergency Department.

24.     Weibel went to the Emergency Department and located Dr. Teressa Oldson, a physician

working in the Emergency Department that evening.

25. Weibel told Oldson about the incident involving Plaintiff and his family, indicating that it was a "he-said-she-said" situation and stating that he had not personally witnessed any improper conduct by Plaintiff.

26. Strictly on the basis of Weibel's statements as to what he had been told by Plaintiff's adverse family members, and without performing any sort of examination on Plaintiff, Oldson executed the physician's certification of examination form established by S.C. Code § 44-17-410.

27. Oldson falsely certified on the form that she had examined Plaintiff and determined that he was suicidal and homicidal and needed to be involuntarily hospitalized for examination in a mental health facility.

28. Oldson had not examined Plaintiff at the time she executed the certification of examination form, nor did Oldson ever examine Plaintiff during his time at Greenville Memorial Hospital or otherwise.

29. After Oldson executed the physician's certification, Plaintiff was taken from the exterior door to the Emergency Department itself where he was subjected to various interviews and tests against his will.

30. Plaintiff declined treatment immediately and repeatedly and asked to be released, but Plaintiff was held against his will.

31. No one at Greenville Memorial Hospital had any lawful basis to detain Plaintiff or to treat him against his will.

32. Later that evening, Greenville Memorial Hospital social worker Mary Schneider executed the affidavit required by S.C. Code § 44-17-410 despite having no personal knowledge

whatsoever of any conduct by Plaintiff signifying mental illness or dangerousness.

33. Neither Oldson nor Schneider completely filled out the certificate or affidavit prior to signing them. Plaintiff was held overnight, and the certificate and affidavit were finished the next day by a Greenville Memorial Hospital employee named Kay Hornaday.

34. During Plaintiff's time at Greenville Memorial Hospital, Plaintiff and his wife made repeated efforts to obtain information about his status and when he would be released.

35. Greenville Memorial Hospital employees repeatedly gave false information to Plaintiff and his wife about his status, falsely telling both Plaintiff and his wife that Plaintiff would be released within specified periods of time.

36. Greenville Memorial Hospital employees repeatedly gave false information to Plaintiff and his wife about his legal status as well, falsely stating that Plaintiff was merely being held for observation and would be released if no symptoms of suicidal or homicidal conduct were observed within specified time frames.

37. However, Mary Schneider did admit to Plaintiff that Oldson had executed the certification of examination prior to Plaintiff's arrival in the Emergency Department on the basis of what Oldson had been told by a third party (Plaintiff later determined the third party was the police officer who transported him).

38. After learning that Oldson had ordered Plaintiff involuntarily hospitalized sight unseen, Plaintiff demanded to be examined at his own expense by a physician other than Oldson, preferably a psychiatrist or other physician unaffiliated with Greenville Memorial Hospital.

39. Plaintiff communicated this demand to Mary Schneider, who later told Plaintiff that his request had been denied and that he would not be permitted to see another physician while at Greenville Memorial Hospital.

40. Plaintiff's medical records executed by Oldson verify that what Mary Schneider told Plaintiff was correct.

41. Plaintiff's medical records clearly demonstrate that at the time Oldson executed the certificate of examination, Plaintiff had not been examined by Oldson or anyone else at Greenville Memorial Hospital.

42. Plaintiff's medical records show that Oldson executed the certification of examination at 8:15 p.m. the evening Plaintiff was taken to the hospital, yet Plaintiff's medical records also show that Plaintiff's first contact with any medical staff occurred at 8:20 p.m. when Plaintiff was triaged in the Emergency Department.

43. After Plaintiff complained that he had not been examined by a physician, Oldson fraudulently altered Plaintiff's chart to show that she had examined him at about 9:00 p.m. No such examination occurred, and the certificate of examination executed by Oldson along with other documents clearly demonstrate that Oldson did not execute the certificate of examination after this 9:00 p.m. examination.

44. During Plaintiff's stay at Greenville Memorial Hospital, details about Plaintiff's status were illegally shared with Plaintiff's adverse family members in violation of Plaintiff's medical privacy rights.

45. The next day, in consultation with Plaintiff's adverse family members, Greenville Memorial Hospital decided to transfer Plaintiff to SpringBrook Behavioral Health System, a mental hospital in Traveler's Rest, South Carolina.

46. As part of Plaintiff's transfer, Dr. Richard Mills certified that Plaintiff was stable for transport. As part of that certification, Mills correctly determined that Plaintiff was neither suicidal nor homicidal.

47.     At no time during Plaintiff's involuntary confinement at Greenville Memorial Hospital did Plaintiff display any symptoms of suicidal or homicidal conduct or ideation, or any other conduct that would lead to any conclusion that Plaintiff was mentally ill to the point that involuntary hospitalization was justified.

48.     At all times during his involuntary stay at Greenville Memorial Hospital, Plaintiff was recorded on security camera videos.

49.     Plaintiff made repeated requests for the security camera video footage to be preserved as evidence in anticipated litigation, and Plaintiff expressly communicated to Greenville Memorial Hospital that litigation in this matter was an absolute certainty. Plaintiff made these requests while he was present in the hospital and after his discharge, both orally and in writing.

50.     Despite Plaintiff's timely written requests that Greenville Memorial Hospital preserve the security camera footage that would have shown that Plaintiff was never examined by Oldson or any other doctor during his time in the facility, Greenville Memorial Hospital nonetheless destroyed the security camera footage after receiving Plaintiff's preservation requests.

51.     When Plaintiff arrived at SpringBrook, Plaintiff's intake examination was largely conducted by Jill Aiken, an employee of SpringBrook and de facto administrator of the adult inpatient section.

52.     Plaintiff explained that his detention was illegal and explained that he was never examined by a doctor at Greenville Memorial Hospital. Plaintiff asked Aiken to review his records from Greenville Memorial Hospital, correctly anticipating they would show that Plaintiff was ordered involuntarily hospitalized prior to even arriving in the Emergency Department.

53.     Aiken assured Plaintiff she would investigate the Greenville Memorial Hospital records, but she either did not investigate the records or did so and did not release Plaintiff despite

knowing that his hospitalization was illegal.

54. During his intake, Plaintiff learned that the family members adverse to him were attempting to give SpringBrook funds in connection with his stay at the facility. Plaintiff objected to SpringBrook accepting any funds from proponents of his involuntary hospitalization. Aiken promised Plaintiff that SpringBrook would not accept any funds from his adverse family members, but Aiken lied—SpringBrook took $5,000 from Plaintiff's adverse family members over Plaintiff's objection after lying to Plaintiff and assuring Plaintiff they would not accept such funds.

55. During Plaintiff's stay at the facility, Plaintiff was examined by a psychiatrist named Dr. Sergio Sanchez and a social worker named Kia Morgan.

56. At no point in time during Plaintiff's stay at SpringBrook did anyone affiliated with SpringBrook actually conclude that Plaintiff was suicidal or homicidal or in any way met the criteria for involuntary hospitalization.

57. The vast majority of Plaintiff's medical records from SpringBrook explicitly show that Plaintiff was neither suicidal nor homicidal and did not meet the standard for involuntary hospitalization. The few records that indicate otherwise did not accurately reflect the opinions of the individuals who generated them.

58. For example, on the fourth and fifth days of Plaintiff's stay at SpringBrook, Sanchez completed physician's progress notes which express that Sanchez had not concluded that Plaintiff met the standard for involuntary hospitalization.

59. However, in between those progress notes, Sanchez filed an examiner's report with the probate court falsely stating that he believed Plaintiff did meet the standard for involuntary hospitalization, even though the internal records showed that Sanchez harbored no such belief.

60. Morgan also filed a document stating that she believed Plaintiff met the standard for involuntary hospitalization because she had observed Plaintiff "arguing" on the phone with adverse family members. Morgan neglected to write in her report that Plaintiff's argument with adverse family members occurred because Morgan directed Plaintiff to contact his adverse family members over his objection, after Plaintiff had expressly told everyone involved he never wanted to have any contact with those individuals again. When the conversation predictably devolved into an argument, Morgan reported to the probate court that Plaintiff was a danger to himself and others even though Morgan had not concluded any such thing.

61. Plaintiff was ultimately held in SpringBrook for eleven days until a hearing was held before the probate court. At the hearing, the probate court dismissed the commitment case against Plaintiff and ordered him released.

62. Like Greenville Memorial Hospital, SpringBrook repeatedly gave false information to Plaintiff, to his wife, and to his attorney about his status. SpringBrook repeatedly promised to discharge Plaintiff on specific days, even though SpringBrook had no intention of doing so.

63. At no point during his time in SpringBrook did Plaintiff manifest any conduct or symptoms of suicidal or homicidal ideation or that would have given SpringBrook any basis whatsoever to continue to detain Plaintiff.

64. SpringBrook denied Plaintiff the ability to communicate with the outside world in any effective way.

65. Jill Aiken threatened Plaintiff repeatedly, stating that if Plaintiff made any efforts to challenge SpringBrook's right to detail him, she would disclose Plaintiff's stay in the facility to Plaintiff's professional contacts and cause Plaintiff extreme embarrassment.

66. Jill Aiken attempted to coerce and threaten Plaintiff into relinquishing his legal rights in

the family dispute that led to his involuntary hospitalization, despite that fact that Plaintiff expressly stated that he would not do so and would allow his lawyer to handle the matter from that point forward.

67. Eventually, after Plaintiff realized that SpringBrook's continuing promises of imminent release were lies, Plaintiff confronted Aiken about the situation. Aiken told Plaintiff that because SpringBrook would be liable if Plaintiff harmed himself or someone else after releasing him, Plaintiff would be held until a court ordered SpringBrook to release Plaintiff, regardless of what the clinical analysis had demonstrated. Aiken told Plaintiff that it did not matter that he had not shown any evidence of suicidal or homicidal conduct or ideation while under observation at SpringBrook because the mere chance that Plaintiff might do something was sufficient to justify his detention until a court ordered his release.

68. During Plaintiff's detention in SpringBrook, Plaintiff and his lawyer repeatedly requested to see Plaintiff's medical records in time for Plaintiff's hearing before the probate court.

69. SpringBrook promised to provide the records but did not do so, and Plaintiff and his lawyer did not have access to any of his medical records at the probate court hearing.

70. SpringBrook continued to ignore Plaintiff's requests for access to his medical records after his release. Finally, SpringBrook sent an incomplete set of records to Plaintiff.

71. Plaintiff continued to harass SpringBrook for the rest of his records. Finally, SpringBrook sent another set of records to Plaintiff, but numerous records remain missing.

72. SpringBrook lost or destroyed various of Plaintiff's medical records even though Plaintiff and his lawyer made contemporaneous requests for copies of such records even as they were being generated.

73. Even so, the records SpringBrook did turn over demonstrate without any question that

Plaintiff's detention in SpringBrook was unlawful and that at no point in time did SpringBrook's staff ever conclude that Plaintiff was a danger to himself or anyone else or that Plaintiff met the standard for involuntary hospitalization.

74. The materials filed with the probate court by Sanchez and Morgan were false and did not accurately reflect Sanchez's and Morgan's view as to Plaintiff's status.

75. In fact, the examination referenced in Sanchez's report to the probate court did not actually occur, as demonstrated by Plaintiff's 15-minute observation records.

76. During Plaintiff's stay in SpringBrook, Defendant Justin Chandler interrogated Plaintiff on site, despite Defendant Chandler's knowledge that Plaintiff was represented by counsel and had invoked his <u>Miranda</u> rights.

77. Defendant Chandler lied to Plaintiff about the reason for his interrogation, and defamed Plaintiff by communicating false statements about Plaintiff to SpringBrook regarding Plaintiff's psychiatric condition.

78. Defendant Chandler attempted to bolster his false statements to SpringBrook by falsely claiming to hold an Associates Degree in Psychology. Defendant Chandler has no such degree.

79. Defendant Chandler further claimed that his encounter with Plaintiff was pursuant to orders given to him by the Chief of the Simpsonville Police Department, a claim that also turned out to be false.

80. Defendant Chandler violated Plaintiff's rights under <u>Miranda</u> and engaged in substantial dishonesty about Plaintiff and about his own credentials with regard to his communications with SpringBrook.

81. As a result of the illegal conduct by Greenville Memorial Hospital staff and SpringBrook Behavioral Health staff, Plaintiff was held illegally in both facilities for 12 days.

82. During this time, Plaintiff suffered severe financial and professional damage, and Plaintiff suffered extreme emotional distress as well. Plaintiff's wife suffered similar damages. Plaintiff's marriage has been severely damaged as well.

83. Plaintiff and his wife both suffer from post-traumatic stress disorder as a result of this ordeal, and Plaintiff and his wife both believe they have suffered other psychiatric consequences as a result of this matter as well.

84. None of the foregoing requires expert testimony, as it is within the realm of the knowledge of a layman that doctors and medical staff cannot falsely certify medical examinations that did not occur, nor can they falsely state that they have reached conclusions based on examinations that they have not actually reached. It is likewise within the realm of the knowledge of a layman that doctors and medical staff cannot destroy medical records to prevent a litigation opponent from obtaining them, nor can doctors and medical staff lie to patients and their representatives about the legal and medical status of the patient.

### FOR A FIRST CAUSE OF ACTION
VIOLATIONS OF 42 U.S.C. § 1983

85. Defendants violated Plaintiff's civil rights by unlawfully seizing him and forcing him to undergo an unwanted medical evaluation in violation of his rights under the Fourth, Fifth, and Fourteenth Amendments.

86. Defendant Jason Weibel had probable cause to detain Plaintiff after Plaintiff was cleared by EMS, yet Weibel continued to detain Plaintiff anyway in violation of Plaintiff's Fourth and Fourteenth Amendment rights.

87. The remaining Defendants violated Plaintiff's rights pursuant to the Fourth, Fifth, and Fourteenth Amendments by unlawfully detaining Plaintiff without any lawful basis whatsoever.

88. Plaintiff seeks all remedies available under 42 U.S.C. § 1983.

89. Defendant Jason Weibel's transport of Plaintiff to Greenville Memorial Hospital constituted false arrest, as Weibel had no lawful authority under state or federal law to transport Plaintiff outside of the City of Simpsonville.

90. The legal basis for Plaintiff's continued detention and transport was S.C. Code § 44-13-05, which does not in any way authorize the transportation and treatment forced on Plaintiff by Weibel's actions.

91. At all times relevant to this matter, the City of Simpsonville had a policy to transport individuals in circumstances similar to Plaintiff's in ways that violated South Carolina law and the Fourth, Fifth, and Fourteenth Amendments.

92. Weibel nonetheless transported Plaintiff under color of state law to Greenville Memorial Hospital and illegally forced Plaintiff to undergo an unwanted and illegal medical examination as a result.

93. For the reasons stated above, all other Defendants are likewise liable to Plaintiff for the unlawful detention under color of state law in violation of Plaintiff's federal constitutional rights.

94. Plaintiff and Plaintiff's wife assert a claim under 42 U.S.C. § 1983 against all Defendants in this action for violation of Plaintiff's constitutional rights.

95. Plaintiffs specifically allege <u>Monell</u> liability as to each Defendant that is not a natural person.

## FOR A SECOND CAUSE OF ACTION
### FALSE ARREST

96. Plaintiffs assert claims against Defendants for false arrest, seeking all damages available under South Carolina law for the commission of the tort of false arrest.

## FOR A THIRD CAUSE OF ACTION
### MALICIOUS PROSECUTION

97.     Plaintiffs assert claims against Defendants for malicious prosecution, seeking all damages available under South Carolina law for the commission of the tort of malicious prosecution.

### FOR A FOURTH CAUSE OF ACTION
#### MEDICAL MALPRACTICE

98.     Plaintiffs assert claims against all Defendants engaged in the practice of medicine, or in related professional disciplines, for medical malpractice. Specifically, Plaintiffs allege that based on the above-explained set of facts, Defendants committed medical malpractice in this action, causing Plaintiffs substantial damages.

### FOR A FIFTH CAUSE OF ACTION
#### VIOLATION OF THE S.C. OMNIBUS ADULT PROTECTION ACT

99.     Defendants each violated the South Carolina Omnibus Adult Protection Act, codified at S.C. Code § 43-35-5 et seq.

100.    In particular, Defendant Justin Chandler and the medical defendants engaged in egregious violations of the Act, harassing Plaintiff and, in numerous cases, actively lying to Plaintiff and to Plaintiff's wife in an effort to inveigle Plaintiff into falsely admitting some sort of inappropriate conduct or to badger Plaintiff into waiving various rights Plaintiff had against his adverse family members or others.

101.    Plaintiff and, to the extent permissible under the statutes, Plaintiff's wife seek all damages available under this cause of action.

### FOR A SIXTH CAUSE OF ACTION
#### FALSE IMPRISONMENT

102.    Defendants are each liable to Plaintiffs for the tort of false imprisonment based upon the foregoing allegations.

### FOR AN SEVENTH CAUSE OF ACTION
#### ABUSE OF PROCESS

103. As to medical defendants and as to Defendant Chandler, Plaintiffs allege that each engaged in abuse of process with regard to Plaintiff.

104. Each medical defendant involved stood to profit from what happened with Plaintiff.

105. Defendant Chandler had a secret monetary arrangement in place with Plaintiff's adverse family members such that Defendant Chandler would profit should Plaintiff be detained for a substantial period of time.

106. Plaintiffs seek all recoveries under law available for this cause of action.

### FOR A EIGHTH CAUSE OF ACTION
DEFAMATION

107. Each Defendant, at some point, published defamatory communications as to Plaintiff that were actionable per se.

108. Plaintiff seeks all recoveries available under law for this cause of action.

### FOR A NINTH CAUSE OF ACTION
BREACH OF CONTRACT

109. Each medical provider defendant breached a contract with Plaintiff (albeit a contract Plaintiff never agreed to) to provide competent medical care to Plaintiff, in the particulars described above.

110. Plaintiff seeks all recoveries available under law for this cause of action.

### FOR A TENTH CAUSE OF ACTION
BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT

111. Each medical provider defendant breached a contract with Plaintiff (albeit a contract Plaintiff never agreed to) to provide competent medical care to Plaintiff, in the particulars described above.

112. Each breach was accompanied by numerous fraudulent acts committed by the various medical provider defendants.

113.    Plaintiff seeks all recoveries available under law for this cause of action.

## FOR AN ELEVENTH CAUSE OF ACTION
ADDITIONAL CAUSES OF ACTION

114.    Under South Carolina law, it is not necessary to specify each and every potential cause of action asserted in a Complaint. The assertion of facts sufficient to give rise to relief is all that is necessary.

115.    Plaintiffs allege that the conduct of Defendants described above is actionable on numerous diverse theories and causes of action, and Plaintiffs reserve the right to assert additional causes of action by way of amendment or simply by virtue of such claims having been asserted based on the facts pled in this Complaint.

## PRAYER FOR RELIEF

Wherefore having fully pled the causes of action described herein, Plaintiffs demand a jury trial and request damages of all types available under the causes of action pled, including but not limited to actual damages, punitive damages, treble damages, prejudgment interest, the costs of bringing this action, attorneys fees, and such other recoveries as may be authorized under the law applicable to the causes of action asserted or such other causes of action as may afford relief to Plaintiffs.

    s/J. Todd Kincannon  
J. TODD KINCANNON, ID #10057  
THE KINCANNON FIRM  
P.O. Box 7901  
Columbia, South Carolina 29202  
Office:   877.992.6878  
Fax:      888.704.2010  
Email:    Todd@TheKincannonFirm.com  

April 20, 2015                          Attorney for Plaintiffs